Donald ROY

v.

The INHABITANTS OF the CITY OF
AUGUSTA et al.

Supreme Judicial Court of Maine.

June 2, 1978.

James E. Mitchell & Jed Davis, P. A. by
Jed Davis (orally), Augusta, for plaintiff.

Sanborn, Moreshead, Schade & Dawson
by Gordon H. Smith (orally), Charles E.
Moreshead, Augusta, for defendants.

Before McKUSICK, C. J., and POMER-
OY, WERNICK, ARCHIBALD, DELA-
HANTY, GODFREY and NICHOLS, JJ.

WERNICK, Justice.

In September 1976 the municipal officers
of the City of Augusta granted plaintiff
Donald Roy a license to operate a billiard
room on Cony Street in Augusta until May
1, 1977. Plaintiff applied for the prescribed
annual renewal of his license, which the
municipal officers refused on April 13, 1977.
Seeking judicial review, plaintiff brought
an action in the Superior Court (Kennebec
County) against the Inhabitants of the City
of Augusta and the City's municipal offi-
cers. Plaintiff asked the Court to direct

the municipal officers to renew his license.[1] On November 16, 1977 the Superior Court sustained the decision of the Augusta municipal officers. Plaintiff has appealed from this judgment, and we sustain the appeal.

Under 8 M.R.S.A. § 1 a person who keeps a bowling alley, shooting gallery or billiard room without a license "forfeits $10 for each day that such alley, gallery or room is so kept." As part of the same statutory scheme, 8 M.R.S.A § 2 delegates the licensing responsibility to the various municipalities under guidelines, relevant here, as follows:

"Municipal officers of towns may license suitable persons to keep bowling alleys, shooting galleries, pool, bagatelle and billiard rooms therein, in any place where it will not disturb the peace and quiet of a family, for which the person licensed shall pay $10 to such town. Such licenses expire on the first day of May after they are granted, unless sooner revoked."[2]

As purportedly in accord with this enabling statute, the Augusta City Council enacted an Ordinance providing:

"Sec. 3–7. Bowling alleys, shooting galleries, pool, billiard rooms—license required, prerequisites.

"(a) No person shall operate a bowling alley, shooting gallery, pool or billiard room without obtaining a license from the municipal officers.

"(b) Such license shall be granted only if the location is in such a place that it will not disturb the peace and quiet of a family, and such license shall be renewed on or before the first day of May annually." (Code 1957, Ch. 15, § 8)

In the instant situation the municipal officers of Augusta refused to renew plaintiff's license because of evidence that large numbers of young people assembled on the public sidewalk, or street, outside of plaintiff's billiard room, and such assemblages constituted a disturbance to the peace and quiet of families in the area. There was no evidence before the municipal officers that the activities going on inside the billiard room disturbed the peace and quiet of any family; indeed, the evidence was plainly to the contrary.

The statutes here involved date back to the middle of the 19th century [3] when bowling (and playing billiards) suffered the moral stigma described in *State v. Haines,* 30 Me. 65, 75, 76 (1849):

"The 'hurt' or injury to the community, which has occasioned bowling alleys kept for gain and common use to be regarded as common nuisances, arises from their tendency to withdraw the young and inconsiderate from any useful employment of their time, and to subject them to various temptations. . . . Clerks, apprentices and others are induced, not only to appropriate to them hours, which should be employed to increase their knowledge and reform their hearts, but too often to violate higher moral duties to obtain means to pay for the indulgence. Other bad habits are in such places often introduced or confirmed. The moral sense, the correct principles, the temperate, regular and industrious habits, which are the basis of a prosperous and happy community, are frequently impaired or destroyed. Bowling alleys without doubt may be resorted to by many persons without such injurious results. The inquiry is not what may be done at such places without injury to persons of fixed habits and principles, but what has been in the experience of man, their general tendency and result. The law notices the usual effect, the ordinary result of a pursuit or course of conduct, and by that

1. The Superior Court initially remanded the case for a new hearing because of the lack of a proper record of the original proceedings before the municipal officers. After the municipal officers conducted another hearing and *again* voted to deny the application for license renewal plaintiff filed an amended complaint in the Superior Court.

2. In 1977, the Legislature deleted the phrase "of towns" after the word "officers" and substituted "$20" for "$10" in the first sentence of this statute.

3. P.L.1855, chap. 167; P.L.1855, chap. 141; and R.S.1857, chap. 29.

decides upon its character. It need not be the necessary and inevitable result of a bowling alley kept for gain and common use, that it is thus injurious to the community, to make it a common nuisance."

Because in the mid-1800's, as *State v. Haines* decided, a bowling alley was deemed *per se* a common nuisance, the keeping of a bowling alley was *per se* unlawful; the activity itself was evil, as exerting "immoral" influences.

In 1855, six years after the decision in *Haines,* the Legislature ameliorated the common nuisance approach of *Haines.* Acknowledging that if properly regulated a bowling alley can be "suitably" kept, the Legislature by P.L.1855, chap. 167 authorized municipalities to license "suitable" persons to keep bowling alleys and further provided that any bowling alleys kept without a license would be unlawful. To govern the exercise of the licensing power, as delegated to municipalities, the Legislature prescribed that no license shall be issued for the keeping of a bowling alley if ". . . it will disturb the peace and quiet of any neighborhood or family." P.L.1855, chap. 167 § 6. In addition, the Legislature in the same statute prohibited the use of the premises where a bowling alley is kept during certain hours, or by a minor without the consent of a parent or guardian, or for gaming or the drinking of intoxicating liquors. P.L.1855, chap. 167, §§ 3, 4.

Also in 1855 the Legislature, by a separate statute, undertook to regulate the activity transpiring in billiard rooms by establishing particular hours for the use of the premises and prohibiting the use of the premises by minors without the consent of a parent or guardian. P.L.1855, chap. 141, § 1. However, it was not until 1857 that the keeping of billiard rooms was made subject to licensing provisions similar to those previously established for the keeping of bowling alleys. R.S.1857, chap. 29, §§ 3, 4. Municipal officers were then given responsibility for the licensing of any "suitable" person to keep a billiard room ". . . in any place where it will not

disturb the peace and quiet of a family." R.S.1857, chap. 29, § 4.

The mores of the mid-1800's may have warranted upholding the constitutionality of legislation *specially* regulating, by licensing, the keeping of bowling alleys and billiard rooms under a standard so broad that incidents occurring on the public sidewalks or streets *outside* the confines of a bowling alley or billiard room could constitute a disturbance justifying denial of a license— on the rationale that the *per se* "immorality" of such activities made such external disturbances highly expectable. In modern times, however, bowling and playing billiards weigh much differently in our scale of values; they are acceptable, and indeed respectable, as beneficial recreational pursuits. Thus regarded, these activities have no greater likelihood of being accompanied by incidents arising on a public sidewalk, or street, outside the confines within which the activity is conducted than various other activities of recreation, or amusement, for which there is no regulation by licensing as specially directed to avoiding disturbance to family peace and quiet.

Hence, while recognizing that without violation of constitutional guarantees the Legislature may select a limited phase of a generalized problem for application of a limited remedy, see *Williamson v. Lee Optical, Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), we believe that current values have rendered constitutionally suspect the regulation, by licensing, here under scrutiny *if* it is given an interpretive breadth which would authorize a license to be withheld by reason of incidents occurring on a public sidewalk, or street, outside the spatial limits within which the activity is conducted.

■ To avoid such constitutional jeopardy to the statutes here involved, and because we find in the history of the legislation as well as in the present language of the statutes sound basis for our conclusion, we interpret the licensing regulation of 8 M.R.S.A. § 2 to be concerned *solely* with what is involved in the activity of bowling, playing billiards or shooting, *per se,* as it may go on *within the confines* of a bowling *alley,* a billiard *room* or shooting *gallery.*

Turning first to the legislative history, we find that in 1915 the Legislature subjected the keeping of "shooting galleries" to the same licensing regulation prescribed for bowling alleys and billiard rooms. P.L. 1915, chap. 63. This addition reveals to us that the Legislature had recognized a change in the policy rationale of regulation. By putting shooting galleries in a grouping with bowling alleys and billiard rooms, the Legislature manifested obvious concern with the very nature of the activity as noisy and thus inherently capable of constituting a disturbance to peace and quiet if precautions to contain the noise should not be adequate.

The language of the statutes, too, is consonant with this interpretation. The licensing authorized is to be of "suitable" persons

". . . *to keep* bowling alleys, shooting galleries, pool, bagatelle and billiard rooms therein, in any place where *it* will not disturb the peace and quiet of a family." (emphasis supplied)

In this grammatical context the word "it" does not refer to "any place", thus to allow *location,* whether internal or external, to be evaluated in terms of disturbance, but relates back to the *keeping* of a bowling alley, shooting gallery or billiard room as the subject-matter to be assessed. By thus focusing on the nature of bowling, playing billiards and shooting as activities taken within themselves, the statute discloses legislative intendment that these activities as they are conducted, respectively, within the confines of an *alley, gallery* or *room* are to be measured in terms of whether adequate precautions have been taken to contain whatever potential for disturbance may be involved in the conduct of such activities *per se.*

So interpreting 8 M.R.S.A. § 2, we decide that the language of the Augusta Ordinance mandating that a license to operate a billiard room

". . . shall be granted only if the *location* is in such a place that *it* will not disturb the peace and quiet of a family" (emphasis supplied)

delineates a criterion of regulation broader than is authorized by the statute. For present purposes, the excess of the Ordinance which must be held a nullity lies in the extent to which the Ordinance allows the *location* of the billiard room, including its external environs, rather than the nature of the activity of playing billiards itself to be deemed capable of constituting a disturbance.

In the instant situation the evidence before the municipal officers indisputably negated that anything involved in the playing of billiards, as such activity was being conducted within the confines of the billiard *room* of plaintiff, constituted a disturbance to the peace and quiet of any family. The municipal officers here reached their decision denying plaintiff a license renewal solely on the ground that incidents occurring on the public sidewalk, or street, outside of plaintiff's billiard room were a disturbance to family peace and quiet. Thus, in denying plaintiff a renewal of his license, the Augusta municipal officers acted unlawfully by relying precisely on that part of the Augusta Ordinance which is a nullity because in excess of the regulatory scope authorized by the enabling statute. Moreover, on the evidence before the municipal officers there was no basis within the *lawful* prescriptions of the Augusta Ordinance for a valid denial of plaintiff's application to renew his license, and, therefore, the Superior Court should have directed the municipal officers to grant the license renewal for which plaintiff had applied.

The entry is:

Appeal sustained; judgment set aside. Case remanded to the Superior Court with directions that the Court order the municipal officers of the City of Augusta to grant plaintiff a renewal of his license to operate a billiard room on Cony Street in Augusta.

McKUSICK, C. J., and POMEROY, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ., concurring.